# EXHIBIT A

**American Arbitration Association**
**Commercial Arbitration Tribunal**
AAA Number: 01-17-0001-9032
In the Matter of the Arbitration between:

Scott Huff and David Fillers, individually, and derivatively on behalf of Destructive Devices Industries, LLC, Claimant(s)
Represented by Morrisroe & Associates, LLC
-vs-
Palmetto State Armory, LLC, Respondent(s),
Represented by Willoughby & Hoefer

# FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated June 1, 2016, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, hereby AWARD as follows:

This matter arises from a failed integration of a business owned by the Claimants, Destructive Devices Industries, LLC ("DDI") with the Respondent, Palmetto State Armory, LLC ("PSA"). The parties have requested a reasoned award based on the record which consists of all the filings with American Arbitration Association in this matter and all the testimony, exhibits, and post hearing briefs filed by the parties.

**Factual Background**

DDI is a company that produced AK-47 and AK-74 style rifles and had extensive experience in producing the AK-47 platform firearm. The individual Claimants, Huff and Fillers, were majority owners prior to the admission of PSA as member. Initially, DDI produced both

1

stamped and milled rifles; that is, rifles assembled from kits which were sourced from Eastern European countries. TX 17:12-15.

DDI was working to develop a domestic, 100% American-made version of the AK-47 firearm, with the aim of being able to sell the firearm without the need for any additional foreign kits. TX 24:5-12.

DDI was introduced to PSA through one of their mutual vendors, Schmid Engineering. TX 344:21-24.

Through initial, casual discussions, the idea of DDI and PSA working together seemed to be mutually beneficial. DDI was a smaller company with design engineering expertise but limited market exposure. PSA had sales and marketing capability that DDI could benefit from, including the development of a DDI website to increase sales. TX 24:20-25:3.

DDI was interested in being associated with PSA; inter alia, because such an arrangement would enhance its notoriety and public exposure, due to PSA's size and name recognition.

DDI maintained its accounting and inventory through QuickBooks, which is a software package designed for companies to track sales and inventory, accounting functions, and other financial aspects of the general operations of the company. TX 34:13-24.

The goal of the DDI-PSA relationship, as stated by Jamin McCallum PSA Principal was to produce two different versions of the AK-47 platform firearm, with DDI producing the premium model and PSA producing the lower-end, civilian-grade model. TX 524:18-21. Initially, the discussions focused on cooperation in building an "American made" AK-47. Shortly thereafter, the nature of the relationship expanded and, the parties agreed that PSA would join DDI as a Member with 51% ownership and voting rights.

Initially the parties worked together to develop the target products, and PSA assumed responsibility for certain aspects of the operations of DDI. This spirit of cooperation eroded toward the end of 2016 as a result of the insistence by PSA that the DDI operations move from Tennessee to South Carolina and from difficulties in DDI's production of the rifles. The parties profoundly disagree on almost every aspect of the events from the end of 2016 through the beginning of 2017. By February 2017, the relationship was failing and the operations of DDI and PSA separated during the second quarter of 2017. This arbitration was filed in March 2017.

After fact discovery took place, an evidentiary hearing was held in Columbia, South Carolina September 25-27, 2018. The parties then provided post-hearing briefs and requests for the award of attorneys' fees.

**Statement of Case**

Claimants' Arbitration Submission contained three counts, (i) Breach of Contract, (ii) Conversion, and (iii) Breach of Fiduciary Duty.

In response, PSA filed its Answer and Counterclaim, containing eight counter-claim counts, including (i) Breach of Contract as to Fillers, (ii) Breach of Contract as to Huff, (iii) Breach of Fiduciary Duty as to Fillers, (iv) Breach of Fiduciary Duty as to Huff, (v) Fraud as to Fillers, (vi) Fraud as to Huff, (vii) Negligent Misrepresentation as to Fillers, and (viii) Negligent Misrepresentation as to Huff.

Claimants' Count I is premised upon alleged violations by PSA of the Amended and Restated Operating Agreement.

The elements for breach of contract are the existence of the contract and its breach. Claimants' Count II is based upon the theory of conversion.

Conversion is the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the exclusion of the owner or otherwise such that there is an alteration of the condition thereof of the owner's rights.

Claimants' Count III is premised upon PSA's alleged breaches of its fiduciary duties owed to DDI, Huff, and Fillers.

PSA has asserted a Counterclaim that has eight separate counts, sounding in four different theories.

Respondents' Counts I and II alleges Breach of Contract against Fillers and Huff.

Respondent's Counts III and IV allege Breach of Fiduciary Duty against Fillers and Huff.

Respondent's Counts V and VI allege Fraud against Fillers and Huff.

Respondent's Counts VII and VIII allege negligent misrepresentation against Fillers and Huff.

**Claims**

Claimants assert claims sounding in breach of contract, conversion, and breach of fiduciary duty. Many of these claims overlap and the Panel determined to address them by the factual allegations and by legal authority.

Before turning to the specific claims, there is a threshold matter that was specifically raised with the parties to address before the hearing closed. The two Claimants are individuals who were members of DDI. Nonetheless, they assert they are not only making their individual claims, but also claims made "derivatively" on behalf of DDI. Claimants cite S.C. Code Ann. 33-44-1101 as authority for their right to assert a derivative claim on behalf of DDI. Respondent contends that Claimants may not assert a derivative action because Claimants failed to specifically plead allegations required by that section. The Panel notes that PSA owned 51% of

4

DDI and takes judicial notice that any effort to get PSA, as majority owner of DDI, to bring an action against PSA as a member of DDI would be fruitless. Therefore, the Panel, recognizing the relaxed pleading requirements in arbitration, concludes that Claimants have a right to assert a derivative action on behalf of DDI.

*Use of Technical Data Packages*

A technical data package ("TDP") consists of all the design information necessary to produce a particular firearm. Claimants contend that DDI's TDP contained valuable confidential information and DDI was to retain sole and exclusive control of the TDP per the Operating Agreement. Claimants also assert that PSA inappropriately used the TDP that belonged exclusively to DDI. Although PSA admits that it retained one copy of the relevant TDP, it asserts that (i) the TDP was intended to be shared, (ii) PSA made substantial contributions to the TDP such that it was no longer the exclusive property of DDI and (iii) any copy it made of the TDP was not usable or commercially viable.

The Panel finds that there was insufficient evidence to prove that the TDP contained confidential information that DDI did not intend to share with PSA. The Panel credits the testimony that, during the period of the relationship, the intention was that the TDP was to be shared between DDI and PSA. Indeed, one of the objectives of the relationship was to establish a common or standard platform for the domestic AK-47 which could only be accomplished if there was joint access. By the time that the parties broke apart, there is no evidence that PSA used or was able to use the data it retained. Finally, even if Claimants had proven the right to recover on this issue, there was a total failure of evidence as to the value of the TDP. As a result, Claimants cannot recover for the TDP.

*Relocation to South Carolina*

In the pre-hearing briefing, Claimants made certain allegations concerning the decision to relocate DDI's operations to South Carolina. During the hearing, however, Claimants asserted that they were not seeking an award based on this event. In any event, the evidence was uncontested that the decision was made at a time when PSA had majority voting control of DDI and there was insufficient or credible evidence that the decision was motivated by anything other than a business judgment, even if the Claimants did not agree.

*Lease Payments on DDI Lease in Tennessee*

Claimants assert that PSA failed to make payments on the DDI lease of a building in Tennessee. There is no dispute that PSA was never a party to that lease. It appears that Claimants, however, assert that PSA agreed to make those payments on behalf of DDI as part of the relocation of the DDI operations.

Claimants have failed to introduce any credible evidence to support this claim. There are no documents to this effect, and the witness testimony was, at best, ambiguous. As a result, Claimants cannot recovery for this allegation.

*Purchase of a Gun Range*

Physically present at the DDI Tennessee location was a gun range that had been constructed for DDI. Claimants assert that PSA agreed to purchase this gun range. PSA denies this assertion.

As an initial matter, Claimants have failed to prove that the gun range even belonged to DDI. It is uncontested that it was never listed as an asset of DDI and that the associated liability was never reflected on DDI's books. Finally, while there is some evidence that there were negotiations about the gun range, there is no evidence that a binding agreement was ever reached or that there was any detrimental reliance on PSA actions. Claimants cannot recover on this allegation.

*Equipment and Inventory*

It is uncontested that DDI inventory and equipment was moved from Tennessee to South Carolina and then, a few months later, moved back. The parties strongly dispute the quality and value of the inventory at all relevant points in the relationship. Claimants specifically assert a diminution in value of the inventory and equipment of $528,000. PSA asserts that the value of the inventory was lower than reflected on the books at the time it became a member of DDI.

As to the Claimants' affirmative claims, they have the burden of proving the value of the equipment and the inventory at the time it was shipped to South Carolina and then the diminution of that value in the hands of PSA. This they have failed to do. Indeed, the preponderance of the evidence strongly suggests that the book value of the inventory was inaccurate. Indeed, given that the Claimants sold 51% of DDI for $240,000, that strongly indicates that the valuation attributed to the equipment and the inventory on the books was not accurate. Claimants are not entitled to recovery in connection with this issue.

*Customer Service Problems*

The parties agree that there were problems with PSA customer service in late 2016 and the beginning of 2017. The parties also agree that PSA had some obligations to respond to customer service issues for DDI.

Not every business failing is actionable. If PSA customer service was not ideal, neither was it a complete failure nor an intentional problem. Even if the problems could be construed as a breach of contract, Claimants have entirely failed to quantify any damages associated with this problem. Accordingly, this problem does not support an award.

*PSA Failure to Produce for DDI*

The parties largely agree that PSA did not produce AK-47s for DDI (or for PSA). They dramatically disagree, however, on the reasons. The Claimants assert that the failure to produce was intentional and part of a nefarious plan to destroy DDI. Respondent asserts that this was a business judgment based on the problems with the DDI design that led to product failures and issues with the quality and quantity of the DDI inventory.

The Panel does not substitute its judgment for the business judgment of PSA which will be sustained unless it was clearly incorrect and actionable. In this matter, while Claimants provided evidence that suggested the extractor problems were not significant enough to stop production; it is uncontested that there were at least some extractor failures. Further, Respondent introduced substantial evidence that there were legitimate concerns about producing rifles with knowledge of extractor problems; therefore; its business decisions related to the rifle production were reasonable. As a result, there is no award with respect to this issue.

*PSA Use of DDI Equipment*

Claimants assert that PSA improperly used DDI equipment for its own purposes rather than using it exclusively for DDI. Respondent agrees that some of the usage was for its own account, but asserts that this was with the permission and agreement of the Claimants.

The Panel has determined that the evidence clearly supports the Respondent's position and notes, in particular, exhibit R-75. In any event, to the extent that any damages flow from this alleged improper use, Claimants have entirely failed to quantify those damages which would also preclude any award.

*Claimants' Salaries*

Claimants are the proper parties to assert these claims, however the claims should be asserted against DDI and not Respondent unless Claimants could prove that Respondents' action caused DDI to not be able to pay salaries. Simply put, Claimants did not prove that Respondent affirmatively diverted funds or prevented any payment of amounts due by DDI. There is no award based on these facts.

*Improper Withdrawal of PSA*

Claimants assert that PSA's withdrawal from DDI was improper. The only relevant basis for such assertion under the Operating Agreement is that PSA was in breach at the time of withdrawal. As indicated in the balance of this award, the Panel is unable to discern any breach on the part of PSA. Nonetheless, the Panel also notes that even if such breach were identified, Claimants have failed to prove any damages or harm associated with such withdrawal. As far as the evidence provided, it does not appear that PSA requested or was given any refund of any

portion of its capital contribution. In the absence of any monetary harm from the withdrawal, the Panel need not determine whether it was improper.

*Account Payable to AGS*

In the pre-hearing filings, Claimants assert a claim for an account payable to AGS, a separate entity from DDI that imports shotguns from China. The Panel has canvassed the entire record, and finds no support for any claim against Respondent. Further, the Panel notes that even if such a claim were to exist, it would belong to AGS and not to the Claimants. No award is made with respect to these facts.

*Failure to Pay Promissory Notes*

It is explicit that any payments to be made on the notes is subject to the sole discretion of PSA, the then-majority owner of DDI. Accordingly, if PSA chose not to pay the notes while it was the majority owner, its judgment cannot be second-guessed since there is no evidence of fraud, gross negligence or intentional misconduct. Of course, once it withdrew, Claimants were then free to cause DDI to make payments on the notes if it could, but that has nothing to do with Respondent. No award is made on the notes.

*Miscellaneous Assets*

Claimants make a potpourri of claims relating to miscellaneous assets. The Panel has considered those claims and find them unsupported by the evidence in the record and declines any award with respect to them.

*Diminution in Value of DDI*

Claimants make a generic assertion that some or all of the actions recounted above caused DDI's value to diminish by slightly over $9 million, of which they claim 49%, or about $4,726,706. As an initial matter, as indicated above, the Panel has largely found against Claimants on these allegations. More critically for this claim, however, is the near total lack of evidence that the pre-PSA value of DDI was $9 million and a total lack of credible evidence on the post-PSA value of DDI. Business valuation is more than introducing tax returns, balance sheets, and income statements into evidence. The Panel credits the expert called on behalf of the Respondent that there is no support for Claimant's valuation.

**Counterclaims**

For its own part, PSA brings a the following eight counterclaims against the Claimants: (i) Breach of Contract by Fillers; (ii) Breach of Contract by Huff; (iii) Breach of Fiduciary Duty by Fillers; (iv) Breach of Fiduciary Duty by Huff; (v) Fraud by Fillers; (vi) Fraud by Huff; (vii) Negligent Misrepresentation by Fillers; and (viii) Negligent Misrepresentation by Huff. One problem that affects many of these counterclaims is that PSA asserts claims that do not belong to it but belong to DDI. Unlike the Claimants, Respondent controlled DDI and could have asserted any claims against the Claimants that were owned by DDI. Respondent did not assert any claims on behalf of DDI and therefore cannot prevail on any claims that were DDI's.

The counterclaims sound in breach of contract, breach of fiduciary duty, fraud, and negligent misrepresentation. As with the analysis of the claims, these counterclaims substantially overlap. Accordingly, the Panel addresses the counterclaims by substance rather than legal theory.

*Mismanagement of DDI*

PSA asserts that, in various ways, the Claimants mismanaged DDI. Claimants deny such assertion. One defect of this claim is that the Claimants were, at all times, employees of DDI, not PSA. As a result, even if their conduct were extreme enough to form the basis of a claim, such claim would belong to DDI, not PSA. Second, not all conduct that is not perfect is actionable. The Panel was unable to discern proof of any misconduct so extreme that it could form the basis for recovery. Finally, even if there was actionable mismanagement, PSA entirely failed to quantify the damages that resulted. As a result, there is no recovery for this set of allegations.

*Misrepresentation of Assets and Liabilities of DDI*

Respondent asserts that Claimants misrepresented the assets and liabilities of DDI and that it would not have invested in DDI but for those misrepresentations. Claimants dispute this claim, although they do concede at least some inaccuracies (for example, the gun range). The Panel did not delve into the details of this counterclaim because Respondent did not introduce any meaningful reliance on these representations nor any quantification of its loss. Respondent, therefore, is not entitled to any award on this counterclaim.

*Misrepresentation of Design Progress*

Respondent asserts that Claimants misrepresented the quality of the TDP at the time it acquired its interest in DDI. There is no doubt that there were at least some perceived issues with the TDP. The Panel need not determine the specific design details for two reasons. First, there is absolutely no evidence that Claimants did not believe that the TDP was accurate and reliable.

Second, Respondent had full ability during due diligence to make its own judgment and had personnel qualified to do so. As a result, no award is due for this counterclaim.

*Misappropriation of PSA Assets*

Respondent alleges that DDI in some fashion misappropriated PSA assets. As far as the Panel can tell, however, Respondent did not pursue this claim during the hearing and did not introduce any evidence to support it. Accordingly, no award is made for this counterclaim.

**Attorney's Fees**

The arbitration clause allows the Panel to allocate attorney's fees, and costs in this matter. The Respondents entirely prevailed on the Claimants claims, and the Claimants prevailed on the counterclaims. Although there is no precise way to perform an allocation, it is the Panel's judgment that 90% of the arbitration was due to Claimants and 10% due to Respondent.

Inexplicably, and contrary to the direct direction of the Panel, Claimants have not submitted any calculation of attorney's fees and the record is now closed. As a result, they have waived this claim. Respondent asserts a claim of $315,995 but does so in an extremely summary fashion, merely citing 947.8 hours for one attorney and 244.8 hours for another, without even disclosing the relevant billing rates. This puts the Panel in a very difficult position because it has no ability to evaluate the quality of the work or whether some time was unnecessary or excessive.

Accordingly, the Panel reduces the claim by $150,000 to $165,995 to take into account the possible excessive amount of work or misallocation among the attorneys. The Panel then

13

reduces the amount of attorney's fees by 10% as noted above. Accordingly, the calculation of awardable attorney's fees is $149,395.50.

PSA also claims costs of $116,530.82 for various costs including expert fees, e-discovery fees, and arbitration fees. As with the claim for attorney's fees, there is no breakdown and no documentation. Accordingly, the Panel awards arbitration fees paid by PSA only in the amount of $58,265.

Finally, PSA makes a special claim for attorney's fees relating to the various e-discovery disputes resolved by Panelist Slavitt in the amount of $7,625.00. This amount is supported by specific findings and is awarded to PSA.

The administrative filing fees of the American Arbitration Association totaling $33,800.00 and the arbitrators' compensation totaling $73,212.70 shall be borne equally by the parties.

This Award is in full settlement of all claims and counterclaims submitted in this arbitration. All claims not expressly granted herein are hereby denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Dated: November 28, 2018

Chair Signature on behalf of the Panel: _____ Panel Chair
By Express permission of Panel Members